IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| [SEALED], | § | CIVIL NO: _1:21cv47_____ |
| | § | |
| | § | |
| Plaintiff, | § | **ORIGINAL COMPLAINT** |
| | § | **FOR VIOLATIONS OF** |
| | § | **FEDERAL FALSE CLAIMS** |
| v. | § | **ACT** |
| | § | |
| | § | **FILED UNDER SEAL** |
| [SEALED], | § | PURSUANT TO 31 U.S.C. § |
| | § | 3730(b)(2) |
| | § | |
| | § | **DO NOT PUT ON PACER** |
| Defendants. | § | |
| | § | **DO NOT PLACE IN PRESS** |
| | § | **BOX** |
| | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |

**ORIGINAL COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CIVIL NO: _____ |
| *ex rel.* ROBERT HENDRIX, | § | |
| | § | RELATOR ROBERT |
| Plaintiff, | § | HENDRIX'S ORIGINAL |
| | § | COMPLAINT |
| v. | § | |
| | § | **FILED UNDER SEAL** |
| DYNCORP INTERNATIONAL LLC, | § | PURSUANT TO 31 U.S.C. § |
| DAMCO U.S.A., INC., and | § | 3730(b)(2) |
| DIPLOMAT FREIGHT SERVICES, INC., | § | |
| | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

**RELATOR ROBERT HENDRIX'S ORIGINAL COMPLAINT**

## TABLE OF CONTENTS

I.    Introduction ..................................................................................................1

II.    Jurisdiction and Venue ................................................................................3

III.   Introduction to Relator Robert Hendrix .....................................................3

    A.  Background on Relator ......................................................................3

    B.  Original Source and Disclosures ......................................................3

IV.   Introduction to Defendants ..........................................................................4

    A.  DynCorp International LLC ..............................................................4

    B.  Damco USA, Inc...............................................................................4

    C.  Diplomat Freight Services ................................................................5

V.    Vicarious Liability .......................................................................................5

VI.   Background on AFCAP .................................................................................6

VII.  Background on CIVPOL ...............................................................................7

VIII. Federal Acquisition Regulation (FAR)........................................................7

    A.  Overview ...........................................................................................7

    B.  Part 15 – Contracting by Negotiation ..............................................8

    C.  Part 31 – Contract Cost Principles and Procedures .........................8

    D.  Section 52.244-2 – Consent to Subcontracts...................................9

    E.  Part 52 – Allowability of Costs ......................................................11

    F.  Section 52.232-25 – Prompt Payment ...........................................11

    G.  Consequences of Noncompliance...................................................13

IX.   Defendants' Fraudulent Activities...............................................................13

    A.     DynCorp's Relationship with Damco ..............................................13

B.      Damco conspired with DFS to inflate freight weight. .......................................17

C.      Defendants improperly billed the Government fuel surcharges. ..........................18

D.      Damco used unauthorized "lump sum" charges to mask the actual per
        kilogram cost. ....................................................................................................20

E.      Defendants' Violations of the FAR .................................................................20

X.      Actionable Conduct by Defendants .........................................................................21

A.      Applicable Law – The False Claims Act .........................................................21

B.      Defendants' Violations of the FCA .................................................................22

        1.      Presentation of False or Fraudulent Claims
                (31 U.S.C. § 3729(a)(1)(A)) .................................................................22

        2.      Making or Using False Records or Statements Material to False or
                Fraudulent Claims (31 U.S.C. §3729(a)(1)(B)) ......................................23

        3.      Conspiracy (31 U.S.C. §3729(a)(1)(C)) .................................................25

XI.     Causes of Action ....................................................................................................26

A.      Count I - Presentation of False or Fraudulent Claims
        (31 U.S.C. § 3729(a)(1)(A)) ...........................................................................26

B.      Count II - Making or Using False Records or Statements Material to False or
        Fraudulent Claims (31 U.S.C. §3729(a)(1)(B)) .................................................27

C.      Count III - Conspiracy (31 U.S.C. §3729(a)(1)(C)) ............................................28

XII.    Demand for Jury Trial .............................................................................................30

XIII.   Documentary Evidence.............................................................................................30

1.     On behalf of the United States of America, Plaintiff/Relator Robert Hendrix ("Hendrix" or "Relator") brings this action pursuant to the False Claims Act (FCA), 31 U.S.C. § 3729-3732. Relator seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and would respectfully show the following:

## I.    INTRODUCTION

2.     DynCorp International LLC ("DynCorp") was one of six contractors chosen in 2005 to participate in the United States Department of the Air Forces Logistics Contract Augmentation Program (AFCAP), which supports the provision of supplies to American troops and federal agencies stationed throughout the world.

3.     For purposes of this action, DynCorp provided logistics support to U.S. interests in Afghanistan, Iraq, Qatar, United Arab Emirates, and Kyrgyzstan. In late 2011, DynCorp jettisoned its freight forwarding contractor, EWC. It did so even though EWC had consistently met its contractual requirements – in fact, EWC had handled much more freight than originally anticipated – and had billed DynCorp accurately and properly. In its place for shipments into the Middle East originating outside of the United States, DynCorp chose Damco USA, Inc. ("Damco") from among several bidders, including one who at first was awarded the contract, to gain discounted access to Damco's quality consolidation center (QCC) in Dubai. Damco and DynCorp entered a Master Service Agreement under which Damco would provide logistics support not just under AFCAP, but under all of DynCorp's contracts with the United States, including LOGCAP, Counter Narco Terrorism Police Offensive ("CNTPO"), and Civilian Police (CIVPOL), utilizing the QCC in Dubai for consolidation and shipping.

1

4.      Just as with the LOGCAP IV contract, under AFCAP Contracts III – V, DynCorp subcontracted with Damco to provide freight forwarding services for AFCAP.[1] Damco did not own any planes and utilized Diplomat Freight Services (DFS) as its sole freight forwarder for air shipments.

5.      Damco's involvement with the CIVPOL contract began in approximately 2009. As with the AFCAP contracts, Damco used DFS to forward freight from the United Arab Emirates to locations around the world, primarily Iraq in this case. DFS handled the Southwest Asia portion of CIVPOL while other carriers were contracted for other regions.

6.      As detailed below, Damco invoiced DynCorp, and ultimately the Government, for fuel surcharges that DFS was never charged and which were never incurred. Furthermore, DFS perpetrated its own fraudulent schemes on many of the same AFCAP shipments under its subcontract with Damco.  Specifically, DFS charged dim weight prices on every shipment, causing Damco to then charge DynCorp inflated prices.

7.      Finally, Damco, and correspondingly DynCorp, defrauded the Government by unreasonably billing individual items as "lump sums." Damco frequently hid behind "lump sum" charges as a means of concealing overcharges and distorting actual, per kilogram costs.

8.      DynCorp represented Damco to the Government as the best value subcontractor even though DynCorp's management was fully aware of Damco's fraudulent mischaracterization of freight, made up costs, improper accessorial charges, and exorbitant bottom line.

---

[1] The AFCAP Master Contract Number is FA8051-05-D-0000. Subsequent AFCAP contracts are as follows: AFCAP III (No. FA3002-06-D-0005 (2005-2015)), AFCAP IV (No. FA8051-15-D-0000 (2015-2019)), and AFCAP V (No. FA8051-18-R-0000 (2019-Present)).

9.     Defendants' fraud has resulted in multi-millions of dollars of wrongful reimbursement from the United States Government.

## II.    JURISDICTION AND VENUE

10.     Jurisdiction and venue are proper in the Eastern District of Texas pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Eastern District of Texas. Defendants engage in business in the Eastern District of Texas and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## III.    INTRODUCTION TO RELATOR ROBERT HENDRIX

### A.    Background on Relator

11.     Relator Robert Hendrix is an individual who resides in Tarrant County, Texas and was formerly employed by DynCorp International LLC.

### B.    Original Source and Disclosures

12.     There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which his allegations are based. Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and provided this

information to the United States prior to filing a complaint by submitting a pre-filing disclosure statement on December 17, 2020 and February 2, 2021.

13.     As required pursuant to 31 U.S.C. § 3730(b), Relator will serve an original disclosure statement on the Attorney General of the United States and the United States Attorney for the Eastern District of Texas contemporaneously with the service of this Original Complaint.

## IV.     INTRODUCTION TO DEFENDANTS

### A.     DynCorp International LLC

14.     Defendant DynCorp International LLC ("DynCorp") provides logistical support of military operations worldwide. DynCorp is a Delaware corporation located at 13500 Heritage Parkway, Fort Worth, Texas 76177, with its principal office located at 3190 Fairview Park, Suite 900, Falls Church, Virginia 22042. DynCorp may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### B.     Damco USA, Inc.

15.     Defendant Damco USA, Inc. ("Damco") does business under several assumed names, including Maersk Logistics. Damco specializes in worldwide freight forwarding services. Damco is a Delaware corporation with its United States headquarters located at Giralda Farms, Madison Avenue, P.O. Box 880, Madison, New Jersey 07940. Damco may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

16.     Damco is managed by Damco International A/S, formerly known as Maersk Logistics International A/S. Damco International A/S operates as a subsidiary of A.P. Moller-

4

Maersk Group, which is the parent company of Damco International A/S and Defendant Damco USA, Inc.

**C.    Diplomat Freight Services, Inc.**

17.    Diplomat Freight Services, Inc. ("DFS") has provided global freight forwarding services by air and ocean for both the commercial and Government sectors for over thirty years. Specifically, DFS provides packaging and third-party logistics services. DFS's corporate headquarters are located at 105 Eastern Avenue, Suite 103, Annapolis, MD, 21403. DFS may be served through its registered agent, William E. Carlson, 250 West Pratt Street, Suite 2000, Baltimore, MD 21201.

18.    DFS is a subcontractor to Damco USA for a number of Government contracts, including the AFCAP and CIVPOL contracts relevant to this case. DFS does not own any aircraft and instead utilizes the services of other companies, such as Ark Airways and Zet Avia, to transport air cargo for its clients.

* * *

19.    Defendants DynCorp International LLC, Damco USA, Inc., and Diplomat Freight Services, Inc. are collectively referred to herein as "Defendants."

**V.    VICARIOUS LIABILITY**

20.    Any and all acts alleged herein to have been committed by any or all of the Defendants were committed by said Defendants' officers, directors, employees, representatives, or agents who at all times acted on behalf of their respective Defendant(s) and within the course and scope of their employment.

## VI.     BACKGROUND ON AFCAP

21.     The Air Force Contract Augmentation Program (AFCAP) was initially conceived and implemented to increase the logistics capabilities of Civil Engineering (CE) and Services (SV) personnel during worldwide contingency operations. Contractors assist with sustainment tasks, thus freeing up active duty and air reserve personnel to focus on fundamental military missions, ensuring they remain remained fully staffed and operationally ready.

22.     During the Vietnam War, the heavy use of contractors led the Army to determine that a need existed for a preplanned method for utilizing contingency operating bases. In 1985, the Army formalized this concept as the Logistics Civil Augmentation Program (LOGCAP). AFCAP has been in existence since 1997 and was similarly created to preplan for worldwide contingency operations to support civil engineers (base construction), logistics, and other services.

23.     The first AFCAP contract was awarded to Readiness Management Support (RMS) in February 1997 and was a $452,600,000 cost-reimbursement-award-fee contract for one base year plus four option years. The 325th Contracting Squadron at Tyndall Air Force Base in Florida was the contracting agency (F08637-97/C-6001). RMS also won the rebid of the contract in February 2002, which called for one base year and seven option years. Like the Army and Navy contracts, it was a cost-plus-award-fee contract.

24.     The subsequent AFCAP contract, AFCAP II, was in effect until February 2010. The AFCAP contracts relevant to this case are AFCAP Contracts III – V, which were in effect during different parts of the relevant timeframe of 2011 to present.

25.     Just as with the LOGCAP IV contract, under AFCAP Contracts III – V, DynCorp subcontracted with Damco to provide freight forwarding services. Damco did not own any planes

and utilized Diplomat Freight Services as its sole freight forwarder for air shipments. As detailed

below, Damco invoiced DynCorp, and ultimately the Government, for fuel surcharges that DFS

was never charged and which were never incurred.

## VII.    BACKGROUND ON CIVPOL

26.    Civilian Police (CIVPOL) from the United States and more than 50 other countries

are deployed around the globe in support of international post-conflict stabilization and

redevelopment operations. Like the AFCAP and LOGCAP IV contracts, DynCorp was initially

awarded a contract to provide freight forwarding services for logistics support relating to the

training of civilian police forces and other services needed to support that effort, such as guards

and translators. Contract number S-LMAQM-04-C-0030 was initially awarded to DynCorp by the

United States Department of State on February 18, 2004. There were at least four extensions of

the contract awarded to DynCorp providing for work through 2014. DynCorp has been a major

part of the CIVPOL mission in Iraq since 2004, and it is also working under the CIVPOL contract

with law enforcement institutions in Haiti, Sudan, Liberia, and Afghanistan, and for the Palestinian

Authority. To date, over one billion dollars has been allocated to DynCorp for CIVPOL contracts.

## VIII.    FEDERAL ACQUISITION REGULATION (FAR)

### A.    Overview

27.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly

issued by the Department of Defense, the U.S. General Services Administration, and the National

Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner

for government contracts.  The FAR is codified in Title 48 of the United States Code of Federal

Regulations.

7

**B.    Part 15 - Contracting by Negotiation**

28.    Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract.  *See* 48 C.F.R. § 15.000.  The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value. *See* 48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement. *See* 48 C.F.R. § 2.101(b)(2).

29.    An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance. *See* 48 C.F.R. § 15.304(b).

**C.    Part 31 – Contract Cost Principles and Procedures**

30.    A cost is only allowable when it complies with all the requirements of 48 C.F.R. § 31.201-2, including reasonableness, allocability, generally accepted accounting principles and practices, terms of the contract, and any other limitations listed in Subpart 31.2. *See* 48 C.F.R. § 31.201-2(a). This provision also applies to payment or reimbursement to subcontractors. *See* 48 C.F.R. § 31.204(b). A contractor is responsible for accounting for costs appropriately and for maintaining records and supporting documentation which would be adequate to demonstrate that costs have been incurred or are allocable to the contract. *See* 48 C.F.R. § 31.201-2(d).  Inconsistent costs or non-allowable costs under Subpart 31.2 are voided. *See* 48 C.F.R. § 31.201-2(c).

31.    Costs must therefore be first reasonable as defined by 48 C.F.R. § 31.201-3(a-b). Costs must never exceed "that which would be incurred by a prudent person in the conduct of

competitive business." 48 C.F.R. § 31.201-3(a). Some non-exclusive considerations for cost reasonableness include whether the cost would be (1) "ordinary and necessary for the conduct of the contractor's business" or performance; (2) one that is from generally accepted business practices or an arm's-length bargain; (3) one that is reasonable under the contractor's responsibilities to the United States or public at large; and (4) one that does not significantly deviate from the contractor's established practices. 48 C.F.R. § 31.201-3(b).

32.     For a cost to be allowable under a contract, it must be incurred. *See* 48 C.F.R. § 31.201(a) ("The total cost, including standard costs properly adjusted for applicable variances, of a contract is the sum of the direct and indirect costs allocable to the contract, *incurred or to be incurred*…").

33.     A cost must also be allocable, or chargeable to one or more cost objectives. *See* 48 C.F.R. § 31.201-4. An "allocable" cost is a cost "incurred specifically for the contract." *See* 48 C.F.R. § 31.201-4 (emphasis added). This can be shown by proving that the cost was incurred specifically for the contract; that such cost benefits both the contract and other work but can be reasonably split between those concerns; or it is otherwise necessary to the overall operation of the business. *See* 48 C.F.R. § 31.201-4 (a-b).

**D.     Section 52.244-2 – Consent to Subcontracts**

34.     The AFCAP and CIVPOL contracts incorporate by reference FAR provision 48 C.F.R. § 52.244-2, which requires the prior consent of the administrative contracting officer ("ACO") before a subcontract such as Damco's is entered:

> **52.244-2 Subcontracts**
> (e)(1) The Contractor shall notify the Contracting Officer reasonably in advance
> of placing any subcontract or modification thereof for which consent is required

under paragraph (b), (c), or (d) of this clause, including the following information:

(i) A description of the supplies or services to be subcontracted.

(ii) Identification of the type of subcontract to be used.

(iii) Identification of the proposed subcontractor.

(iv) The proposed subcontract price.

(v) The subcontractor's current, complete, and accurate certified cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions.

(vi) The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract.

(vii) A negotiation memorandum reflecting -

(A) The principal elements of the subcontract price negotiations;

(B) The most significant considerations controlling establishment of initial or revised prices;

(C) The reason certified cost or pricing data were or were not required;

(D) The extent, if any, to which the Contractor did not rely on the subcontractor's certified cost or pricing data in determining the price objective and in negotiating the final price;

(E) The extent to which it was recognized in the negotiation that the subcontractor's certified cost or pricing data were not accurate, complete, or current; the action taken by the Contractor and the subcontractor; and the effect of any such defective data on the total price negotiated;

(F) The reasons for any significant difference between the Contractor's price objective and the price negotiated; and

(G) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

35.    The ACO's consent is also required on modifications to the subcontract. *See* 48 C.F.R. § 52.244-2.

36.    No exemption exists in this provision to allow parties to a subcontract to provide for agreed price modifications without advance notice to the Government and the Government's consent.

10

**E.    Part 52—Allowability of Costs**

37.    Federal procurement contracts may incorporate by reference the standardized contract provisions found in Part 52 of the FAR. Part 52 governs the costs and standards that apply to a contractor's invoice to the United States for charges associated with its performance and its subcontractors' performance. In particular, 48 C.F.R. § 52.216-7 requires the contractor to submit invoices to the Government subject to allowability of costs in accordance with Subpart 31.2. 48 C.F.R. § 52.216-7(a)(1). Under Subpart 31.201-2, a cost is allowable, in relevant part, only if it is (1) reasonable and (2) complies with the terms of the contract. *See* 48 C.F.R. § 31.201-2(a). This includes costs incurred for payment or reimbursement to subcontractors. *See* 48 C.F.R. § 31.204(b). Subpart 31.2 also provides that a contractor is responsible for maintaining records that demonstrate the costs claimed have been incurred, are allocable to the contract, and comply with applicable cost provisions, including this subpart.

38.    Part 52 also provides that allowable costs are limited to (1) the contractor's actual costs for items or services purchased for the contract; (2) costs for supplies and services under a subcontract, provided that those costs are "in accordance with the terms and conditions of a subcontract or invoice;" and (3) financing payments made to subcontractors. *See* 48 C.F.R. § 52.216-7(b)(1).

**F.    Section 52.232-25 – Prompt Payment**

39.    The AFCAP and CIVPOL contracts incorporate by reference FAR provision 48 C.F.R. § 52.232-25, specifying the terms and conditions under which the Government will make its invoice payments:

**52.232–25 Prompt payment.**

As prescribed in 32.908(c), insert the following clause:

PROMPT PAYMENT (OCT 2003)

Notwithstanding any other payment clause in this contract, the Government will make invoice payments under the terms and conditions specified in this clause. The Government considers payment as being made on the day a check is dated or the date of an electronic funds transfer (EFT). . . .

40.    The subpart contained at 48 C.F.R. § 52.232-25(d), in this same version of the regulation, mandates arrangement for return of any overpayment to the Government, upon the contractor's awareness of such overpayment:

**(d)** *Overpayments.* If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall immediately notify the Contracting Officer and request instructions for disposition of the overpayment.

The provision was promulgated in December 2001 and became effective on February 19, 2002, following the issuance of a 1999 General Accounting Office report, which found that contractors rarely returned overpayments on their own initiative. DOD Contract Management: Greater Attention Needed to Identify and Recover Overpayments (Letter Report, 07/19/1999, GAO/NSIAD-99-131), *available at* https://www.govinfo.gov/content/pkg/GAOREPORTS-NSIAD-99-131/html/GAOREPORTS-NSIAD-99-131.htm.

41.    In October 2008, the overpayment provision was modified to include more specific instructions for disposing of the overpayment.  It now states that upon becoming aware of an overpayment, the contractor shall:

(1) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the -

12

(i) Circumstances of the overpayment (e.g., duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);
(ii) Affected contract number and delivery order number if applicable;
(iii) Affected line item or subline item, if applicable; and
(iv) Contractor point of contact.
(2) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

## G.    Consequences of Noncompliance

42.    A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract, constitutes grounds for debarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). Moreover, the Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

## IX.    DEFENDANTS' FRAUDULENT ACTIVITIES

## A.    DynCorp's Relationship with Damco

43.    In early 2011, DynCorp decided to consolidate the administration of its Government subcontracts under one division titled "Center for Excellence." Through this centralized division, DynCorp chiefly wished to streamline authorizations required by Defense Contracting Management Agency ("DCMA") under the Corrective Action Plan ("CAP") DCMA had imposed on DynCorp after DynCorp failed to implement a minimally functional procurement system. Relatedly, DynCorp hoped to save on duplicate administrative costs and to be able to purchase supplies in bulk for all its subcontracts beyond AFCAP. All of DynCorp's subcontract

program managers worked in the Center for Excellence. Later in 2011, DynCorp further decided to rebid its AFCAP subcontract for freight forwarding services.

44.    Late in the bidding process, DynCorp internally recognized that it wanted to subcontract with a partner with access to what it deemed a valuable resource in Dubai: a low-cost consolidation center building, called a "quality control center" or "QCC." DynCorp shipped all the OCONUS procured goods and products it purchased under AFCAP Task Orders to Dubai via air and ocean transport. These goods and products were then consolidated in one area and loaded by DFS onto airplanes for the final destination throughout Southwest Asia.

45.    The initial AFCAP Task Orders that were each processed through Dubai were:

- Task Order 0401—Al Jaber Facilities Maintenance, Kuwait

- Task Order 0501 —AFNORTH, Various Locations

- Task Order 4C01 —Manas Power, Kyrgyzstan

- Task Order 4CO3 —Al Udeid Power, Qatar

- Task Order 4C04 —Manas Engineering Services, Kyrgyzstan

- Task Order 4C10—USAFA Fire Fighters

- Task Order 4C11 —Al Dhafra Fire Alarm Maintenance Support, UAE

- Task Order 4C12 —Vehicle Maintenance and Material Control Services, Bagram & Kandahar

- Task Order 4C13 —LN/TCN Monitors - Bagram & Kandahar

- Task Order 4C14 —Red Horse Vehicle & Heavy Equipment Maintenance - Al Udeid & Kandahar

See exhibit 1 (December 11, 2012 DynCorp International Monthly Meeting Minutes).

14

46.    Without a consolidation center building, DynCorp spent time and money gathering all the goods and products from different locations to one area to palletize and transport them. With a rent-free consolidation center, DynCorp was able to schedule all goods and products to be shipped and stored in one building until the time arrived to transport them to their final destination. Importantly, this was meant to benefit not only its military business, but all of DynCorp's business routed through Dubai. Accordingly, working with a partner that had a QCC appeared to create economic synergies within DynCorp's new Center of Excellence structure.

47.    The United States at no time asked DynCorp to use a QCC or articulated a need for one. DynCorp's Request for Proposal for EWC's replacement shows that DynCorp never asked bidders to bid on providing a QCC *per se*. *See* exhibit 2 (DynCorp's Request for Proposal for EWC's replacement). Instead, the scope of work in the RFP required shipment to and beyond "DynCorp's newly initiated QCC in Dubai." *See* exhibit 3 (Nov. 7, 2011 Advance Notification and ACO Consent Request Form and Attachments).

48.    The regulations governing the AFCAP contract require contractors to present subcontracts for approval before they can be finalized. DynCorp knowingly submitted Damco's bid as the winning bid to the United States Government for approval in November of 2011. *See* exhibit 3.

49.    DynCorp awarded the freight forwarding subcontract to Damco. Yet Damco's technical ratings had been judged low during the previous bidding process; Damco scored poorly on the qualitative 125-question survey examining technical basis, Federal Acquisition Regulations ("FAR") and Department of Defense Federal Acquisition Regulations Supplement ("DFAR") compliance, safety, trade compliance, risk assessments, and legal and financial standing. In its

quest for the use of a QCC, DynCorp now represented Damco's technical score as higher, with changes across the board. Damco's technical score was now number 3, with a score of 82 compared to a previous score of 72.

50.     In demanding the use of the consolidation center, DynCorp knowingly accepted a Damco bid that should have been recognized as unrealistically low. Damco's OCONUS bid of $10,227,000 was at least $1 million lower than Kuehne & Nagel, the next lowest bid.

51.     DynCorp's written submission to obtain Army's Administrative Contracting Officer ("ACO") consent fraudulently represented to the Government that 1) Damco's bid represented the best possible pricing, 2) the subcontract was competitively awarded to Damco, and 3) DynCorp complied with the applicable cost accounting standards for awarding the subcontract to Damco. *See* exhibit 3 at 2-3 (November 7, 2011 Advance Notification and ACO Consent Request Form and Attachments). Fundamentally, the ACO consent misrepresented the actual terms of the subcontract: Damco intended at the outset that it would charge DynCorp, and thus the United States, for accessorial costs not allowed in the written contract and/or not incurred, in exchange for use of Damco's Dubai QCC and simply to make maximum profit, and DynCorp prepared to look the other way. DynCorp and Damco agreed on this method of bidding while submitting an ACO consent that revealed nothing of this plan, and highlighted a per kilo rate as though accessorial costs would be insubstantial.

52.     Before submitting the ACO consent request, Damco entered a Master Services Agreement (MSA) with DynCorp on October 25, 2011, with a one-year term, covering all its freight forwarding needs as to goods originating from abroad, under both private and public contracts. *See* exhibit 4 (DynCorp Master Services Agreement with Damco). As to AFCAP III,

the MSA incorporated DynCorp's RFP and the terms of Damco's winning bid, including its accessorial bid sheet(s). Section 9 of the MSA contemplated modifications to the contract, but only in writing, and only to the Schedule of Pricing as an equitable adjustment in response to a change in goods or services demanded by DynCorp. *Id.*

**B.**     **Damco conspired with DFS to inflate freight weight.**

53.     Damco utilized DFS as its sole airfreight provider for the AFCAP III contract, and these two defendants conspired to maximize their profits via the overcharging of dimensional weight, also known as chargeable weight. Rather than billing the actual weight as indicated on the Master Air Waybill (MAWB) that it prepared for a whole planeload, DFS instead used the dimensional (chargeable) weight obtained from Damco's several House Air Waybills (HAWB) for the same shipment. Dimensional weight is the appropriate pricing measure only when objects or packages are not size-and-weight proportionate and/or are asymmetrical in size. A basketball goal and backboard with stand is a prime example of an object that would fall within the "dim weight" category. DFS was rarely asked to transport "dim weight" freight; certainly, most pallets did not include the kind of extremely light or oddly-shaped freight that qualified for dimensional weight pricing.

54.     This method of billing allowed DFS to make a huge additional profit, ultimately at the Government's expense. Since Damco in turn billed for dimensional weight on virtually every shipment, even when not warranted, the Government was often overbilled for items that did not require a dimensional weight surcharge. DFS and Damco were complicit in the overcharging of dimensional weight and enriched themselves at the Government's expense.

55.     A number of the accessorial charges were based on a per kilo cost fee application. Therefore, when improper accessorial charges were applied based on fictitious weights, the charges accrued in an exponential manner. As an example, if the actual kilo rate were fraudulently inflated by 20% then the corresponding cost of any accessorial based upon weight would increase by the same 20%.  The result would be the grossly inflated cost of every freight movement.

56.     Furthermore, DFS often chartered flights as "round-trip." In all likelihood, DFS "back-hauled" freight on charter flights, which provided further revenue to DFS on flights the Government had already paid for.

57.     In addition to the dim weight fraud, Defendants employed a different and overlapping scheme involving chartered aircraft. DFS, with Damco's permission, made a practice of chartering aircraft at discounted prices even when the cargo being shipped did not require it. DFS would, in effect, purchase an entire aircraft to move a minimal amount of freight, if it could get an inexpensive price. DFS would then load the cargo on the larger-than-required aircraft and, in collusion with Damco, bill for dimensional weight that inflated pricing paid for the chartered aircraft and left room for pure profit. DFS filled the balance of the space in the aircraft with additional weight for a variety of other customers under different contracts. DFS fraudulently billed the other Government customers for the weight being hauled as though there were an actual airfreight cost for the freight movement. DFS was making 100% profit on all additional weight added to the aircraft.

**C.     Defendants improperly billed the Government fuel surcharges.**

58.     A fuel surcharge is a charge billed by the actual owner of an aircraft to offset the volatility (i.e., unexpected increase in fuel cost) of fuel purchased on the world fuel market. Where

18

fuel surcharges are allowed, a cost for cargo is provided to the contractor (Damco) by the owner/operator of the aircraft, DFS, designated for that purpose. When fuel costs increase, DFS is entitled to charge a fuel surcharge to Damco. Damco, with proper approval, in turn, can pass the fuel surcharge on to DynCorp and ultimately the Government for payment. For the fuel surcharge to be legitimate, however, there must be a paper trail of actual fuel cost increase; it cannot be applied arbitrarily at the whim of Damco. Yet Damco did just that, as DFS never invoiced Damco for a fuel surcharge.

59.    Relator obtained documents which demonstrate that Damco invoices related to the AFCAP contract contained the specific accessorial charge for fuel surcharge, described on invoices as 'FSC." These fuel surcharges were fraudulently passed on to DynCorp, and ultimately the United States, for payment.

60.    Relator was communicating with other DynCorp employees who were familiar with the billing practices of Damco because of having access to thousands of Damco billing documents while working at DynCorp. While conducting a review of airfreight accessorial charging under the AFCP contract, Relator's contacts within DynCorp discovered the improper billing practices contained within the Damco invoices.

61.    Specifically, Relator was alerted to fraudulent billings by Damco and later confirmed that all Damco invoices billed to DynCorp, and ultimately the Government, contained a wide-ranging assortment of accessorial costs which were never incurred by Damco. The accessorial issue was a longstanding problem in the LOGCAP IV contract.

**D.**    **Damco used unauthorized "lump sum" charges to mask the actual per kilogram cost.**

62.    Damco, and correspondingly DynCorp, also defrauded the Government by unreasonably billing individual items as "lump sums." Damco frequently hid behind "lump sum" charges as a means of concealing overcharges and distorting actual, per kilogram costs. Additionally, Damco charged unauthorized accessorial fees and fuel surcharges.

**E.**    **Defendants' Violations of the FAR**

63.    Under FAR Subpart 31.201-2, a cost is allowable, in relevant part, only if it is (1) reasonable and (2) complies with the terms of the contract. *See* 48 C.F.R. § 31.201-2(a). This section also provides that a contractor is responsible for maintaining records that demonstrate the costs claimed have been incurred, are allocable to the contract, and comply with applicable cost provisions. *See* 48 C.F.R. § 31.201-2(d).

64.    FAR subpart 52.216-7 provides that allowable costs are limited to (1) the Contractor's actual costs for items or services purchased for the contract; (2) costs for supplies and services **under a subcontract, provided that those costs are "in accordance with the terms and conditions of a subcontract** or invoice;" and (3) financing payments made to subcontractors. 48 C.F.R. § 52.216-7(b)(1) (emphasis added).

65.    DynCorp was required to invoice the Government for payments subject to the allowability of costs and according to other terms of the AFCAP and CIVPOL contracts. Allowable costs are those that are reasonable and comply with the terms of the contract. In addition, FAR 52.216-7 (b)(1) sets out that allowable costs must be (i) DynCorp's own costs of self-performance, (ii) costs related to a subcontract if DynCorp actually incurred them and **"[i]n**

**accordance with the terms and conditions of a subcontract,"** or (iii) progress payments subject to cost principles.

## X.     ACTIONABLE CONDUCT BY DEFENDANTS

### A.     Applicable Law - The False Claims Act

66.     This is an action to recover damages and civil penalties on behalf of the United States arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

67.     The FCA provides that any person who:

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C)     conspires to defraud the Government by committing a violation of [the FCA];

is liable to the Government for a civil penalty for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. 31 U.S.C. § 3729(a)(1).

68.     The FCA defines "claim" as:

> (A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

>> (i)     is presented to an officer, employee, or agent of the United States; or

>> (ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's

21

behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

69.    The FCA allows any persons having knowledge of a false or fraudulent claim against the United States to bring an action in federal district court on behalf of the United States and to share in any recovery as authorized by 31 U.S.C. § 3730.

70.    Based on these provisions, Relator Hendrix, on behalf of the United States, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

**B.    Defendants' Violations of the FCA**

**1.    Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

71.    Defendants have knowingly presented or caused to be presented false or fraudulent claims for reimbursement (i.e., for payment or approval) to the United States by falsely representing and certifying, expressly or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forwarding services as bid and accepted under the subcontract between DynCorp and Damco. Damco caused DynCorp to demand payment falsely and fraudulently for fuel surcharges claimed by Damco that it never incurred under the AFCAP contract.

22

72.     Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the potential to influence the payment decisions of the Government. Because of their fraudulent representations, Defendants earned millions of dollars to which they were not legitimately entitled. The ultimate submission to the Government of claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.

### 2.     Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))

73.     Defendants knowingly made, used, or caused to made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records consist of Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case. Defendants falsely certified, expressly or impliedly, that their statements were true, accurate, and correct, and their costs were incurred. Defendants falsely certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government.

74.     Defendants knew, however, that these prices were false and/or fraudulent because the costs did not include the true accessorial costs intended to be charged, including those described herein, or, as to fuel surcharges, were not incurred. Once performance began under the subcontract, Defendants included these accessorial costs, greatly increasing the cost to the Government for these contracted services. Defendants knowingly passed these inflated costs on to the Government for reimbursement.

75.     Given the structure of the Government contracting system at issue, the Defendants' false statements and representations, and the false records or statements that Defendants made, used, or caused to be made or used, had the potential to influence the payment decisions of the Government.

76.     DynCorp and Damco have issued or caused to be issued false certifications and statements and violated the FAR provisions below.

77.     Each invoice submitted to the Government included the following express certification: "I certify that all payments requested for the appropriate purposes and in accordance with the agreements set forth in the contract." DynCorp submitted invoices via electronic means about every two weeks, and this certification appears on every electronic submission, not via some automatic population process, but because it was written in. For each such invoice that included Damco charges, the invoice indicated that the amount was under Damco's freight forwarding contract and listed a Damco invoice number. This express certification forms the basis for falsity based on express certification. *See, e.g., U.S. ex rel. Howard v. Lockheed Martin Corp*., 14 F. Supp. 3d 982, 988 (S.D. Ohio 2014) ("Vouchers for payment which Lockheed submitted to the Government contained a certification that the costs were applicable, allocable, and reasonable, a standard consistent with FAR 31.").

78.     Likewise, FAR 52.232-4 provides that for transportation-related contracts, the Government shall pay the contractor "upon the submission of properly certified invoices or vouchers, the amount due for services rendered and accepted . . . ." 48 C.F.R. § 52.232-4. Under this provision, which was incorporated into the AFCAP and CIVPOL contracts, DynCorp was required to submit properly certified invoices for all Damco's claims.

79.     As part of AFCAP and CIVPOL, all contractors were required to complete online certifications for their online submission of claims for payment under the Online Representations and Certifications Application ("ORCA"). *See* 48 C.F.R. § 52-204-7000. This later became the System for Award Management ("SAM"). DynCorp made these certifications at the outset and with each voucher.

80.     These certifications and false statements caused the Government to enter into contracts, approve subcontracts and modifications, pay false claims, and not rescind the contract or subcontract. As a result, the United States has suffered substantial damages.

### 3.    Conspiracy (31 U.S.C. § 3729(a)(1)(C))

81.     By virtue of planning, and then implementing their schemes, Defendants' actions violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

82.     Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

83.     Defendants conspired to enter into a mutually beneficial subcontract that resulted in higher earnings for both companies. Defendants knew that the costs submitted by Damco in its bid for the subcontract did not include the true accessorial costs. As to AFCAP, Defendants knew that Damco would charge for unincurred fuel surcharges.

84.     As explained above, DynCorp's initial incentive to subcontract with Damco was the rent-free use of the consolidation center in Dubai, the use of which resulted in significant savings to DynCorp.  In exchange for the free use of Damco's consolidation center, DynCorp

passed through inflated invoice charges to the United States. DynCorp did not object to the inflated invoice costs submitted by Damco as DynCorp's profit margins also increased due to the inflated costs.

85.     Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

## XI.    CAUSES OF ACTION

## A.    Count I – Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

86.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

87.     Defendants have knowingly presented, or caused to be presented, false or fraudulent claims associated with multiple federal contracts.

88.     Specifically, Defendants falsely represented and certified, expressly or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forwarding services as bid and accepted under the subcontract between DynCorp and Damco. Damco caused DynCorp to demand payment falsely and fraudulently for fuel surcharges claimed by Damco that it never incurred under the AFCAP contract.

89.     Given the structure of the Government contracting system, the false statements, false representations, false records, and/or material omissions made by the Defendants had the potential to influence the payment decisions of the Government. Because of their fraudulent

representations, Defendants earned millions of dollars to which they were not legitimately entitled. The ultimate submission to the Government of claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme. As a result, the United States has suffered substantial damages.

90.    The United States paid the false or fraudulent claims.

91.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.    Count II – Making or Using False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

92.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

93.    Defendants knowingly made, used, or caused to made or used, false records or statements material to false or fraudulent claims paid or approved by the United States. These false statements or records consist of Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case. Defendants falsely certified, expressly or impliedly, that their statements were true, accurate, and correct, and their costs were incurred. Defendants falsely certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government.

94.    Defendants knew, however, that these prices were false and/or fraudulent because the costs did not include the true accessorial costs intended to be charged, including those described herein, or, as to fuel surcharges, were not incurred. Once performance began under the subcontract, Defendants included these accessorial costs, greatly increasing the cost to the Government for

27

these contracted services. Defendants knowingly passed these inflated costs on to the Government for reimbursement.

95.     Given the structure of the Government contracting system at issue, the Defendants' false statements and representations, and the false records or statements that Defendants made, used, or caused to be made or used, had the potential to influence the payment decisions of the Government.

96.     The United States paid the false or fraudulent claims.

97.     Defendants' false records and statements were foreseeable factors in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**C.    Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C))**

98.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

99.     By planning and implementing their schemes, Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

100.    Defendants knowingly conspired to falsely certify that their statements were true, accurate, and correct. These false statements or records include Defendants' false certifications or representations of compliance with all laws in requesting payments for performing the contracts at issue in this case.

101.    Defendants conspired to enter into a mutually beneficial subcontract that resulted in higher earnings for both companies. Defendants knew that the costs submitted by Damco in its

28

bid for the subcontract did not include the true accessorial costs. As to AFCAP, Defendants knew that Damco would charge for unincurred fuel surcharges.

102.    As explained above, DynCorp's initial incentive to subcontract with Damco was the rent-free use of the consolidation center in Dubai, the use of which resulted in significant savings to DynCorp.  In exchange for the free use of Damco's consolidation center, DynCorp passed through inflated invoice charges to the United States. DynCorp did not object to the inflated invoice costs submitted by Damco as DynCorp's profit margins also increased due to the inflated costs.

103.    Defendants have conspired in knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the United States and have conspired in knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. The United States has suffered substantial damages because of Defendants perpetrating their conspiracy.

104.    The United States paid the false or fraudulent claims.

105.    By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### PRAYER FOR RELIEF

106.    WHEREFORE, Relators respectfully request that the Court enter judgment against the Defendants and award the following:

(1)    Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

(2)    Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

29

(3)    The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4)    All costs and expenses of this litigation, including attorney's fees and costs of court; and

(5)    All other relief on behalf of Relator or the United States that the Court deems just and proper.

## XII.    DEMAND FOR JURY TRIAL

107.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## XIII.    DOCUMENTARY EVIDENCE

108.    The following documentary evidence is referenced herein:

| Exhibit No. | Description |
|---|---|
| 1 | December 11, 2012 DynCorp International Monthly Meeting Minutes |
| 2 | DynCorp's Request for Proposal for EWC's replacement |
| 3 | November 7, 2011 Advance Notification and ACO Consent Request Form and Attachments |
| 4 | DynCorp Master Services Agreement with Damco |

30

Respectfully submitted,

**BERG & ANDROPHY**

Joel M. Androphy
TX State Bar No. 01254700
Janis G. Gorton
TX State Bar No. 24071063
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

Greg M. Dykeman
State Bar No. 06325100
Stacie L. Augustine
State Bar No. 24050239
Strong Pipkin Bissell & Ledyard LLP
595 Orleans
1400 San Jacinto Bldg.
Beaumont, TX 77701-3255
Telephone: 409-981-1120
Facsimile: 409-981-1010
gdykeman@strongpipkin.com
saugustine@strongpipkin.com

**ATTORNEYS-IN-CHARGE FOR
RELATOR ROBERT HENDRIX**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 4, 2021, I caused a true and correct copy of this Original Complaint to be served on the United States Department of Justice and the United States Attorney's Office in the Eastern District of Texas via certified mail, return receipt requested.

I further certify that on February 4, 2021, I caused a true and correct copy of this Original Complaint to be sent via electronic mail to Monty Wilkinson, Acting United States Attorney General, at Civilfrauds.quitams@usdoj.gov.

Janis G. Gorton

32